IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 4, 2009 Session

## CAROL J. CATALDO v. LARRY B. STANLEY, SR., Executor of the Estate of James Alton Julian, Deceased

**Direct Appeal from the Chancery Court for Warren County**
**No. 1947-P     Jeffrey F. Stewart, Chancellor**

_____

**No. M2008-02430-COA-R3-CV - Filed September 25, 2009**

_____

This case arises from the denial of Appellant's claim against the Appellee Estate of James Alton Julian. Because Appellant held and exercised a power-of-attorney, a confidential relationship existed. The trial court determined that Appellant failed to overcome the presumption of undue influence, that the claim was satisfied by a specific bequest in the decedent's will, and denied Appellant's alternate theory of quantum meruit. Finding no error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Michael D. Galligan, McMinnville, TN, for the Appellant, Carol J. Cataldo.

J. Stanley Rogers, Christina Henley Duncan, Manchester, TN, for the Appellee, Larry B. Stanley, Sr., Executor of the Estate of James Alton Julian, Deceased.

**OPINION**

James Alton Julian was a contractor and owned several businesses. He lived in Middle Tennessee as a young man, but moved to Florida in the 1960s. There, he developed several subdivisions during Orlando's housing boom after Walt Disney World opened. Mr. Julian and his wife Mary were married for fifty-six years, but no children were born to the marriage. Gerlinde Preston Rogers, a resident of McMinnville and a distant cousin of Mr. Julian, testified that she traveled to Florida on numerous occasions to visit the Julians. When Mrs. Julian became sick in 2001, Ms. Rogers traveled to Florida once a week to care for her and to assist Mr. Julian.

On August 15, 2001, Mr. Julian executed a Last Will and Testament, in which he named his wife as beneficiary and Ms. Rogers as an alternate beneficiary. Ms. Rogers was named as Personal

Representative of the will and the attorney-in-fact in a Durable Power of Attorney and Designation of Health Care Surrogate.

Mary Julian died on November 1, 2001, and was buried in Warren County, Tennessee. Mr. Julian planned to return to Tennessee, and Ms. Rogers went to Florida to help Mr. Julian sell his Florida assets. To that end, she set up an estate sale, which ran for three days in January 2002. Appellant Carol Cataldo attended all three days of the sale. Ms. Cataldo's husband had died on October 13, 2001. Sometime during the sale, Ms. Cataldo and Mr. Julian had a conversation, in which Ms. Cataldo testified that she offered her condolences to Mr. Julian on the loss of his wife. Ms. Cataldo, a registered nurse, also helped Mr. Julian change a dressing on his face.[1] According to Ms. Cataldo, Mr. Julian later asked her if she would come to Tennessee to help him after a scheduled knee surgery.

Mr. Julian moved from Florida to Tennessee in February 2002. In anticipation of his move, Ms. Rogers and Mr. Julian had purchased a home in McMinnville. The house needed significant renovations. According to her testimony, Ms. Rogers supervised most of the work on the house prior to Mr. Julian's arrival. When Mr. Julian moved into the house, Ms. Rogers relinquished her interest in the house to him. Thereafter, Ms. Rogers assisted Mr. Julian with his business and medical affairs.

When he returned to Tennessee, Mr. Julian and Ms. Cataldo maintained telephone contact. On April 20, 2002, Ms. Cataldo stopped by McMinnville while on a cross-country trip. Ms. Cataldo was traveling by motor home to visit her mother in Connecticut. Mr. Julian was scheduled to have knee replacement on April 24, 2002. Ms. Rogers testified that the first time she met Ms. Cataldo was during this visit. According to Ms. Rogers, Ms. Cataldo had parked her motor home in Mr. Julian's yard. Ms. Rogers testified that Ms. Cataldo informed her that she would be taking care of Mr. Julian after the surgery. Ms. Rogers stated that Mr. Julian had not mentioned this arrangement to her prior to her conversation with Ms. Cataldo. Ms. Rogers took Mr. Julian to Baptist Hospital for his surgery, and stayed with him while he was there. When Mr. Julian was released from the hospital, he was transferred to a rehabilitation center. Ms. Rogers testified that she had made arrangements for care givers to sit with Mr. Julian; however, Ms. Cataldo parked her motor home in the parking lot, and proceeded to sit with Mr. Julian. When Ms. Rogers told Ms. Cataldo that her services were not needed, Ms. Cataldo allegedly told Ms. Rogers that she expected to be paid for her services. Ms. Rogers told Ms. Cataldo to leave, but she refused.

Ms. Cataldo took Mr. Julian for his follow-up visit to Baptist Hospital, but did not return him to the nursing facility as planned. Ultimately, Ms. Rogers convinced Mr. Julian to return to finish his rehabilitation, but then he was discharged at the insistence of Ms. Cataldo. Thereafter, Ms. Cataldo slept in the same bed with Mr. Julian. Ms. Cataldo left McMinnville on June 14, 2002, but returned to Mr. Julian's home in the fall.

---

[1] Ms. Cataldo is a registered nurse in Florida. According to the record, she does not hold a nursing license in the State of Tennessee.

Ms. Rogers testified that her relationship with Mr. Julian changed after Ms. Cataldo arrived in Warren County. The locks on Mr. Julian's house were changed, and she was not given a key. The telephone answering machine message was changed to add Ms. Cataldo. Ms. Roger's phone calls to Mr. Julian were often not returned and, when she did speak with him, Ms. Rogers testified that the conversations were strained. Ms. Rogers testified that, when Ms. Cataldo was not there, Mr. Julian was his "old self." The family members were concerned and, Ms. Rogers testified that they had discussed contacting the police to have Ms. Cataldo removed. This did not happen, and the record reveals that a sexual relationship developed between Ms. Cataldo and Mr. Julian. Ms. Cataldo stayed with Mr. Julian on and off from 2002 until his death in 2006.

Attorney Larry B. Stanley, Sr., the Executor of Mr. Julian's estate, testified that he had known Mr. Julian for over forty years, and had done legal work for both Mr. Julian and his mother. Mr. Stanley also saw Mr. Julian socially. In May of 2002, Mr. Julian went to Mr. Stanley to change his Last Will and Testament. Mr. Stanley testified that Mr. Julian was angry with Gerlinde Rogers, and wanted to make a new will. Ms. Rogers testimony confirms that Mr. Julian was angry with her because she put him in the rehabilitation facility following his knee replacement. On May 20, 2002, Mr. Julian executed a new will, naming his nephew Mark Kell as the sole beneficiary. Mr. Kell was Mr. Julian's farm manager at that time; however, in May 2005, Messrs. Kell and Julian had a disagreement and parted ways.

The record indicates that Mr. Julian's health began to rapidly deteriorate during 2005. He suffered from many health problems, including congestive heart failure, diabetes and complications therefrom, coronary artery disease, anemia, arthritis, degenerative joint disease, cataracts, renal insufficiency, ulcer disease, mobility dysfunction, and depression. At one point during the year, he fell and tore open his forearm. Due to complications from this accident, he subsequently had to have the first and second knuckles of his right index finger amputated.

On May 23, 2005, Mr. Julian executed a Durable Power of Attorney in favor of Ms. Cataldo. On the same day, he also executed a new Last Will and Testament, which bequeathed his house, its contents, and his vehicles to Ms. Cataldo. The will reads, in pertinent part, as follows:

> THIRD. I hereby bequeath and devise my house, all its contents, and all my vehicles, to Carol Cataldo.
>
> FOURTH. I hereby give my Executor the authority to sell the remaining assets of my estate at public auction. The proceeds of the sale shall be placed in the Alton Julian Endowed Scholarship fund at Middle Tennessee State University.

Mr. Stanley testified that the value of the assets bequeathed to Ms. Cataldo was between $400,000 and $450,000. Even before executing the Power of Attorney, the record reveals that Mr. Julian had added Ms. Cataldo's name to two of his bank accounts, and that she was writing checks on these accounts. Ms. Cataldo also prepared a typed agreement, which was allegedly executed on

December 11, 2005, providing that Ms. Cataldo would be retroactively paid for her services, beginning April 20, 2002, at a rate of $30 per hour and $50 per night. The agreement also refers to a bequest being made to Ms. Cataldo. A review of this document reveals that Mr. Julian's purported signature is not on the signature line, and is very shaky. When asked about this apparent anomaly, Ms. Cataldo testified that Mr. Julian had signed the document with his left hand because of the surgical removal of part of his right index finger. This agreement reads, in relevant part, as follows:

> In return for caring for me I agree to compensate Carol J. Cataldo....
> I understand her bequest is to be postponed until after my demise...her bequest shall be a priority claim from my estate as she has provided skilled, loving, and constant care during her stay with me....
>
> *                                  *                                  *
>
> Carol J. Cataldo has agreed to accept this bequest based on $30 an hour and 14 hour days...at this time, weeks exceeding 40 hours, weekend, and holiday hours shall remain at $30 an hour as well.... Overnight is a flat $50.00 per night.
>
> Carol J. Cataldo has agreed to defer receiving her bequest until after my demise to protect me and my assets.

As the result of his failing health, Mr. Julian was admitted to the hospital on December 13, 2005. He was transferred to a nursing facility on December 20, 2005. Shortly thereafter, he was returned to the hospital, where he died on January 6, 2006. Mr. Julian was eighty-four years old at the time of his death.

Mr. Julian's May 23, 2005 will was admitted to probate. Following the opening of the Estate, Ms. Roger's testified that she was named the beneficiary of a $100,000 certificate of deposit, and that she had the original certificate in her possession. However, she testified that, following Mr. Julian's death, she was unable to locate the money. Mr. Stanley testified that Mr. Julian had cashed out the certificate of deposit, but that he could not determine what was done with the funds. After Mr. Julian's death, Mr. Stanley also discovered that Ms. Cataldo had converted one of Mr. Julian's bank accounts in the amount of $22,000 to her name. According to Mr. Stanley, this was not a joint account, a survivorship account, or a pay on death account. As Executor, Mr. Stanley did not allow Ms. Cataldo to take the money. Mr. Stanley further testified that, as Executor, he sold the farm and equipment pursuant to the dictates of the will. Mr. Stanley stated that the value of the estate, not including the specific bequests to Ms. Cataldo, was $575,000 to $580,000. Mr. Stanley testified that Ms. Cataldo, who had taken over the day-to-day management of Mr. Julian's farm, approached him about not selling the farm and equipment. Mr. Stanley told her that that was contrary to Mr. Julian's will. When Ms. Cataldo tried to claim some of the farm equipment and a mobile home as "vehicles" which, under the will, were to go to her, Mr. Stanley testified that he became very suspicious.

On May 24, 2006, Ms. Cataldo filed a claim against the Appellee Estate of James Alton Julian, seeking compensation in accordance with the December 11, 2005 agreement in the amount of $408,870. Mr. Stanley, as Executor, excepted to the claim on June 6, 2006, asserting that Mr. Julian's will left Ms. Cataldo not less that $200,000, which satisfied the claim. Mr. Stanley requested a hearing on the law and facts, which was held on July 25, 2008. On September 11, 2008, Mr. Stanley revised his exception to the claim, to include the defenses of undue influence, and that Mr. Julian was not competent to contract at the time of the making of the December 11, 2005 agreement between himself and Ms. Cataldo. By Order of September 30, 2008, the trial court denied Ms. Cataldo's claim. She appeals and raises four issues for review as stated in her brief:

> 1. Whether the trial court erred in determining that the bequest made to Appellant in Mr. Julian's will satisfied any claims she would have for services rendered, when the bequest was of an indefinite or lesser amount than the claim.[2]

> 2. Whether the trial court erred when deciding Appellant was the dominant party giving rise to [a] presumption of undue influence when the claim was for services rendered pursuant to a contract, rather than a gift or other benefit.

> 3. Whether the trial court erred when deciding the Appellant had used undue influence on Mr. Julian in Mr. Julian signing the contract.

> 4. Whether the trial court erred in denying Appellant's claim under a quantum meruit theory in the absence of an enforceable contract.

Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. ***See McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn.1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). The weight, faith, and credit to be given to any witness' testimony lies, in the first instance, with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***See id.***; ***see also Walton v. Young***, 950 S.W.2d 956, 959 (Tenn.1997).

---

[2] We note at the outset that the Estate does not contest the bequest made to Ms. Cataldo in Mr. Julian's will; the issue before this Court is whether Ms. Cataldo's claim against the Estate should be paid in addition to that bequest.

## Doctrine of Satisfaction

In **Locke v. Davis**, 526 S.W.2d 455 (Tenn. 1975), our Supreme Court described the doctrine of satisfaction as follows:

> If the testator's intention is not evident from the language of the will and the surrounding circumstances, in cases where a legacy of the same or greater amount, and agreeing in character and time of payment, with an existing debt of the testator, is given to the creditor by a will which contains no provision indicating a different intention, it is presumed to be in satisfaction of the debt and not in addition to it. Whenever this presumption of satisfaction arises, the creditor-legatee is put to an election and cannot have both legacy and debt.

**Locke v. Davis**, 526 S.W.2d at 457 (citations omitted).

Ms. Cataldo's claim against the Estate is in the amount of $408,870. Ms. Cataldo claims that this amount should be paid in addition to the specific bequest made to her in Mr. Julian's last will. The agreement between Ms. Cataldo and Mr. Julian specifically refers to the payment for nursing services being made by bequest only upon Mr. Julian's death. Mr. Julian's will provides a bequest to Ms. Cataldo of his home, its contents, and his vehicles. The record reveals that there were differing opinions as to the exact value of the bequest. Ms. Rogers opined that the value would be $300,000. The Executor, Mr. Stanley, testified that the value would be between $400,000 and $450,000. There is also the additional complication in this case as to the amount claimed by Ms. Cataldo. As the trial court correctly points out in its ruling from the bench, "[o]nly she would be able to know and testify as to when she was there, and no one would be able to impeach those dates and times. And she's submitted a fairly substantial number of hours that she said she worked." The trial court went on to note that, during some of the time that Ms. Cataldo was staying with Mr. Julian, he was not in need of 24-hour care, yet Ms. Cataldo's claim charges for every day and night that she allegedly spent in Tennessee. Even if we allow, for the sake of argument, that the agreement was properly executed, and even if we allow that Ms. Cataldo is entitled to her full claim of $408,870, the language of the agreement clearly indicates that Mr. Julian's intention is to pay that debt by bequest. As stated in **Locke**, "where a legacy of the same or greater amount [than] an existing debt...is given to the creditor by will...it is presumed to be in satisfaction of the debt and not in addition to it." **Id.** at 457. From the record as a whole, and specifically the language of the agreement, we conclude that any claim for services rendered by Ms. Cataldo was satisfied by the bequest made to her in Mr. Julian's will, and that Ms. Cataldo did not present evidence sufficient to rebut the **Locke** presumption. Concerning the amount of the bequest, the trial court heard evidence from both Ms. Rogers and Mr. Stanley and determined that the bequest sufficiently covered Ms. Cataldo's claim. The evidence does not preponderate against this finding.

**Undue Influence**

In his amended exception to Ms. Cataldo's claim, Mr. Stanley asserts that Ms. Cataldo used undue influence in the procurement of the agreement. Based upon the facts adduced at the hearing, the trial court agreed.

"The most common way of establishing the existence of undue influence is 'by proving the existence of suspicious circumstances warranting the conclusion that the [action] was not the [decedent's] free and independent act.'" *Estate of Hamilton v. Morris*, 67 S.W.3d 786, 792 (Tenn. Ct. App.2001) (quoting *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App.1989)). The most frequently used "suspicious" circumstances are: "(1) a confidential relationship between the testator and the beneficiary; (2) the testator's poor physical and mental condition; and (3) the beneficiary's involvement in the procurement of the [document] in question." *Id*. (citing *Mitchell*, 779 S.W.2d at 388). However, other suspicious circumstances are also recognized: "(1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator." *Id.* at 792-93 (citing *Mitchell*, 779 S.W.2d at 388).

Although there exists no prescribed number of suspicious circumstances that must be met in order to invalidate an action, "the doctrine of undue influence is applicable only where there is a confidential relationship[.]" *In re Estate of Brevard*, 213 S .W.3d 298, 302 (Tenn. Ct. App.2006) (citing *Keasler v. Estate of Keasler*, 973 S.W.2d 213, 219 (Tenn. Ct. App.1997)); *see also Simmons v. Foster*, 622 S.W.2d 838, 840 (Tenn. Ct. App.1981). "Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is." *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App.2002) (citing *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App.1974)). However, "[i]n general terms, it is any relationship that gives one person the ability to exercise dominion and control over another." *Id.* (citing *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 410 (Tenn. 2002)). It is well established in Tennessee that "a confidential relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). The execution of a power of attorney creates a legal confidential relationship and the holder of the power, characterized as the dominant party, serves in a fiduciary relationship to the grantor of the power, but only to the extent of the powers granted. *See* Tenn. Code Ann. § 34-6-107; *Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn.1995); *see also In the Matter of Conservatorship of Groves*, 109 S.W.3d 317, 351 (Tenn. Ct. App. 2003)(citing *Childress*, 74 S.W.3d at 329) ("a confidential relationship arises-through a fiduciary relationship-between a principal and attorney-in-fact to a power of attorney when the power of attorney has been exercised and the attorney-in-fact was active in its procurement").

Under well-settled Tennessee law, "the existence of a confidential or fiduciary relationship, together with a transaction by which the dominant party obtains a benefit from the other party, gives

rise to a presumption of undue influence that may be rebutted." *Matlock*, 902 S.W.2d at 385. Evidence may be introduced to rebut the presumption of undue influence. The weaker party's receipt of independent legal advice is one way of showing fairness. *Richmond v. Christian*, 555 S.W.2d 105, 107-08 (Tenn. 1977). In fact, proof of independent legal advice may be required in certain cases. *Id*. at 108.[3] Otherwise, the court is to consider all of the evidence and apply "sound principles and good sense" in determining whether the transaction was fair. *Childress*, 74 S.W.3d at 329. In cases in which a presumption of undue influence arises from the existence of a confidential relationship, a court may consider "a lack of suspicious circumstances as evidence to rebut an automatic legal presumption of undue influence." *Parish v. Kemp*, No. W2007-02207-COA-R3-CV, 2008 WL 5191291, *6 (Tenn. Ct. App. Dec.11, 2008) (perm. app. denied June 15, 2009). The determination of whether the dominant party exerted undue influence is a question of fact. *Waller v. Evans*, No. M2008-00312-COA-R3-CV, 2009 WL 723519, *9 (Tenn. Ct. App. March 17, 2009).

In this case, there is no question that a confidential relationship existed between Ms. Cataldo and Mr. Julian based upon the fact that Ms. Cataldo held an unrestricted power of attorney. Moreover, the proof is clear that Ms. Cataldo exercised her power as Mr. Julian's attorney-in-fact by handling his financial, business, and healthcare matters. As noted above, "the existence of a confidential or fiduciary relationship, together with a transaction by which the dominant party obtains a benefit from the other party, gives rise to a presumption of undue influence that may be rebutted." *Matlock*, 902 S.W.2d at 385. The presumption of invalidity arising from a confidential relationship extends to all dealings between persons in fiduciary and confidential relations, and includes gifts, contracts and other transactions in which the dominant party obtains a benefit from the other party. *See, e.g., Roberts v. Chase*, 166 S.W.2d 643, 651 (Tenn. Ct. App. 1942). The question, then, is whether Ms. Cataldo presented sufficient evidence to rebut the presumption of undue influence.

Turning to the record, we note that the agreement at issue was allegedly executed just two days before Mr. Julian entered the hospital due to the health problems that ultimately led to his death less than a month later. As part of its proof, the Estate offered the deposition of Dr. Harry E. Burck, Jr. Dr. Burck treated Mr. Julian from March 4, 2002 until his death. In addition to his own experience with Mr. Julian, Dr. Burck also reviewed Mr. Julian's extensive medical records in forming his opinion. This opinion, which is contained in Dr. Burck's July 25, 2007 letter is as follows:

---

[3] In *Richmond*, the court noted:

> Independent advice is ordinarily required where it is a reasonable requirement and where the circumstances are such that it would be difficult to show the fairness of the transaction without proof of independent advice, particularly, where the donor is impoverished by the gift in question or the gift seems to be unnatural under the circumstances of the case.

> *Richmond*, 555 S.W.2d at 108.

It is evident in this review that the patient in November and December of 2005 and early January 2006 was experiencing episodes of confusion and cognitive impairment. During these episodes the patient would not be able to make rational decisions. He was also taking medication, primarily pain medication, that could exacerbate these symptoms.

Dr. Burck's opinion is undisputed in the record. The fact that a contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon sufficient consideration, free from fraud or undue influence...," *Staubach Retail Services–Southeast, L.L.C. v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005), complicates Ms. Cataldo's burden in this case due to Mr. Julian's infirmity at the time of the making of the agreement. But even if we allow, *arguendo*, that Mr. Julian was of sound mind and sufficient health to actually contract, many suspicious circumstances remain concerning the procurement of the agreement.

It is undisputed that Ms. Cataldo, the dominant party, actually wrote the agreement. There were no witnesses to Mr. Julian's alleged signature on the agreement. Mr. Julian was in physical and mental decline at the time of the making of the agreement. Perhaps most significantly, Mr. Julian did not obtain independent advice before entering into the agreement. The record indicates that Mr. Julian's usual course of business was to consult with his long-time attorney Mr. Stanley, and to have Mr. Stanley draw up any legal documents concerning his estate. Although Ms. Cataldo testified that she tried to contact Mr. Stanley three times concerning the agreement, she stated that her calls were unreturned. Mr. Stanley conceded that he could have missed one phone call, but that he would certainly have responded if she had called three times. Regardless, the fact remains that Mr. Julian did not receive independent advice on this agreement, and that fact is undisputed in the record. From all of the circumstances surrounding the agreement between Mr. Julian and Ms. Cataldo, we find that the trial court did not err in either its finding that a confidential relationship existed between these parties so as to give rise to a presumption of undue influence on the part of Ms. Cataldo, or in its finding that Ms. Cataldo failed to rebut this presumption.

## Quantum Meruit

In the event that the agreement between Ms. Cataldo and Mr. Julian is determined to be unenforceable, Ms. Cataldo asserts that she is entitled to compensation for her nursing services under the doctrine of quantum meruit.

It is well settled that the theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 154 (Tenn.1966). Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist. *Whitehaven Community Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn.1998) (citing *Paschall's*, 407 S.W.2d at 154-55). Such contracts are not based upon the intention of the parties but are obligations created by law and are "founded on the principle that a party receiving a benefit

desired by him, under the circumstances rendering it inequitable to retain it without making compensation, must do so." ***Paschall's***, 407 S.W.2d at 154. A contractual obligation under an unjust enrichment theory will be imposed when: (1) no contract exists between the parties or, if one exist, it has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation. ***Whitehaven Community Baptist Church v. Holloway***, 973 S.W.2d 592, 596 (Tenn. 1996). In ***Paschall's***, *supra*, the Court stated:

> Each case must be decided according to the essential elements of quasi contract, to-wit: A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

***Paschall's***, 407 S.W.2d at 156.

In the instant case, the trial court made the following comments concerning Ms. Cataldo's quantum meruit claim:

> Now, there was also a request that [Ms. Cataldo] be allowed to recover under a theory of quantum meruit. I think I've addressed some of those things to some extent by saying that [Mr. Julian] made a fairly substantial bequest to her, which I think would cover all of her needs and expenses since they are essentially the same [] amount [as] her claim was and what actually was provided under the will. And I think then it would be unjust for me to award her any additional sums under the facts and circumstances.

We agree with the trial court that Ms. Cataldo was, in fact, compensated for her work with Mr. Julian based upon the substantial bequest made to her in his will. If this Court were to allow Ms. Cataldo to receive an additional $408,000 based upon her claim under the agreement, this finding would result in Ms. Cataldo receiving a double payment for her services. Moreover, to rule that the additional claim is warranted, would be to negate Mr. Julian's stated intention to provide for the scholarship fund established in his name at Middle Tennessee State University. Notwithstanding the bequest to Ms. Cataldo of the house, contents, and vehicles (totaling approximately $400,000 to $450,000), the remainder of Mr. Julian's estate was valued at approximately $575,000. If this Court were to allow Ms. Cataldo's claim, it would result in her receiving most of the estate. Based upon the language in Mr. Julian's will, this was not his intention. From the record as a whole, we conclude that Ms. Cataldo was well compensated for her services to Mr. Julian by the bequest she received from his will and the doctrine of quantum meruit is not applicable in this case.

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellant, Carol J. Cataldo, and her surety.

_____
J. STEVEN STAFFORD, J.